ÁNGEL LÓPEZ MORALES and his wife MARÍA DEL CARMEN SANTIAGO, Plaintiffs and Appellees, *v.* PUERTO RICO WATER RESOURCES AUTHORITY, Defendant and Appellant.

No. R-67-187.      Decided April 3, 1970.

*José A. Arabía* and *Carlos M. Díaz Lamoutte* for appellant. *Miguel A. Giménez Muñoz* and *Helios A. Zeno Villafañe* for appellees.

MR. JUSTICE RAMÍREZ BAGES delivered the opinion of the Court.

Because the minor Ángel Ildefonso López Santiago, nicknamed Kelly, drowned on November 22, 1962, at the Lake of Patillas, his parents, appellees herein, sued appellant and the Commonwealth of Puerto Rico for damages. The trial court concluded that:

"That the lake in question, and, at the precise place of the accident, was regularly trespassed by small children, who went there to swim, fish, go boating, etc.; which was a known fact to the codefendant, Puerto Rico Water Resources Authority, since previously similar accidents had occurred therein.

"That the place of the accident was devoid of fences, barricades, warnings, signs, to indicate deep waters; and also to indicate the danger consisting in the nearness of the highway to the lake.

"That the day of the accident said lake was full to capacity, and that the same was and is still deep.

"That the risk involved, as to the depth of the water, was not perceptible even to adults, because the darkness of said body of water prevented knowing the depth of the same.

"That the land which borders the lake, at the place of the accident, is soft and yields easily due to natural erosion."

As a question of law the court determined that:

"[a] Codefendant, Puerto Rico Water Resources Authority, should have fenced, or kept watch at the precise place of the lake where the minor Ángel Ildefonso López Santiago drowned, and because of the nearness of said lake to State Highway No. 184, to avoid accidents as the instant one, considering that the extension of the area where the lake borders the highway, at a short distance, is only fifty feet alongside the same and the cost of protecting it would not have been onerous.

"[b] . . . said place was trespassed by minors and that previously similar accidents had occurred in this lake, justify, on the ground of the attendant circumstances in the case at bar, that we should depart from the doctrine established by our highest Court in the case of *Cayetano k/a Santana Vargas Rodríguez, etc.* v. *Water Resources Authority*, decided on September 28, 1962. See also, *Banker* v. *McLaughlin*, 208 S.W.2d 843 and *Altenbach* v. *Lehigh Valley R. Co.*, 37 A.2d 429."

Finally, said court concluded that on account of the negligence and oversight of the deceased minor's parents, the amount of the damages should be reduced in 50% for which reason it punished appellant to pay appellees the sum of $10,000 plus $1,500 for costs, expenses, and attorney's fees.

Appellant assigns that the court erred in determining that it was negligent and in not applying as a question of fact and of law the case of *Vargas* v. *Water Resources Authority*, 86 P.R.R. 99 (1962).

We conclude that it is correct, for which reason the judgment rendered by the trial court in this case should be reversed and another rendered dismissing the complaint.

The facts of the case, according to the record, are recited hereinafter.

On November 22, 1962, which was a holiday as it was the commemoration of Thanksgiving Day, two families with a close relationship from the city of Guayama, Puerto Rico, one with the last name Rovira and the other with the last name López Morales, went to spend a day on the beach. Later they decided to go to the Lake in Patillas to please the minors in the group who wanted to fish and because it was more convenient for them. The Rovira family had knowledge of the area of the accident as they had gone by it frequently.

The group was made up of four adults, that is, two married couples and five minors. The group proceeded to park the motor vehicle in the environs of the highway which borders that part of the lake, leaving part of the tires on the asphalt, at a distance of from two to three feet from the lake. There they began to enjoy the fresh air and shadow of the trees which the place offered and afterwards had lunch and while they talked, they were hearing the horse races and music from a radio.

One of the minors, son of the Roviras, eight years old, that is, a year older than Kelly, the child who had the tragic accident, was given permission to go fishing in the lake. This minor, together with another minor, a little older than he, named Frankie Ortiz, nephew of appellees, age fourteen, went fishing in the environs of the lake and moved away from the group a distance of about one hundred twenty-five feet to one hundred fifty feet. Kelly, who was seven years old, was not given permission as he was younger, although he was one year younger than the other minor, Luis Antonio Rovira, who was given permission to go fishing.

Mrs. Rovira testified that she assumed that it was curiosity that made Kelly follow her son Luis Antonio to watch him while he was fishing; that the adults were not aware that he had left the group although all of us "were watching my son and his (López Morales) nephew, who were on top of a rock fishing."

Kelly's father testified that the Rovira and Ortiz children "were casting a hook at a distance of 100 feet . . . . On a rock . . ." that faces the lake; that Kelly went towards that place walking "Outside of the pavement on the sand . . . . He continued and then I saw him and then Luis Antonio Rovira called from there, 'Kelly fell into the water' and I ran and when I arrived I jumped into the water . . . sometime before reaching the rock . . . because . . . the desperation was so great that I did not reach the place and I jumped somewhat before, not far from the rock . . . ."

The examination of the child Luis Antonio Rovira, close friend of the deceased child, was, in the part pertinent to the accident, the following:

"MR. DÍAZ· LAMOUTTE:

Explain to the Court what happened as a result of which Kelly had that accident.

WITNESS:

Well, after we and Frankie López left to fish on the rock in the Lake of Patillas, he followed us and Frankie told him to return where everybody was at the shore of the lake and he left and Frankie and I went towards the rock and we were there five minutes and he returned and when he returned we told him . . .

How many times had he gone to the rock?

That was the first time that he had come to the rock after he returned.

What did you tell him?

To go back.

And what happened?

We continued fishing and we did not notice whether he left;

I know that he arrived where everybody was and stayed around there.
Did he return?
    Yes, sir.
Where you were?
    Yes, sir.
To the rock?
    Yes, sir.
And what happened?
WITNESS:
    *Then he came down with us . . .*
MR. DÍAZ LAMOUTTE:
He went down where?
    *To the rock.* Then Frankie was lying on the rock with some jars trying to catch fish and I was behind him and *Kelly stood behind me and I told him: 'hold the bamboos'* and two minutes elapsed and we continued fishing without paying any attention to him and *then he slipped from the rock and fell.*
From the same rock where you were standing?
    Yes, sir.
How many times had he gone to that rock before that time?
    He never reached the rock.
But when he fell was he on the rock?
    Yes, sir.
Is the rock near or far from the highway?
    From the pavement?
    Yes.
Here is the highway, and about from here to the window more or less.

.    .    .    .    .    .    .    .    .

JUDGE:
    Twenty to twenty-five feet.

.    .    .    .    .    .    .

MR. GIMÉNEZ:
Where did you buy the cord and the bait to go fishing?
WITNESS:
    Daddy bought it for me when we were going along the way.
When you were on the way to the lake?
    Yes, sir.

Did he buy it because you asked him or what?

I asked him.

Then you wanted to go fishing there?

Yes, sir.

Did they buy Frankie one?

Yes, sir.

As soon as you arrived you began fishing or were you playing for a while?

We were playing for a while next to our parents and the cars.

Then the only ones who were fishing were you and Frankie?

Yes, sir.

The rest were not permitted to go, the parents did not let them go?

Aha.

The rock, is it big or small?

As I remember it was a big rock.

Did it project from the water?

It projected.

Under the water were there more rocks that projected?

I cannot say.

Mr. Giménez:

That same rock, was there part of it under the water?

Witness:

I do not know.

Do you know what moss is?

*Slime.*

A green thing?

Slime.

*Did it have?*

*I do not think so.*

Was it slippery?

*I cannot remember.*

However, you were hanging on.

Yes, because Frankie was lying on the rock, and I was hanging on to Frankie ...

And was Kelly behind you?

*That was when he came that time ...*

When the thing occurred?

Yes.

Frankie was lying on the floor, you were holding Frankie and

*Kelly was behind you?*
    *Yes, sir.*
When all of a sudden you hear that he falls into the water?
    Yes.
It happened so?
    Yes." (Italics ours.)

López Morales as well as witness Juan Vázquez unfruitfully tried to recover the body of the child until late at night. A diver recovered it the following morning.

Juan Vázquez testified that he lives two hectometers away from the Patillas Lake; that he tried to recover Kelly's body diving at the place where Mrs. Rovira indicated to him. His examination continued in the following manner:

"WITNESS:
    The lake when it is full, as on that occasion, is an average of approximately two feet and a half from the road.
MR. GIMÉNEZ:
Was it there where the child appeared?
    Yes, sir.
How is the land beyond the pavement of the highway?
    Beyond the pavement, you stand on the land and easily you go.
Does the land yield?
    Yes, sir, because it is soft on that part.
How are the waters?
    Deep.
Are they clear, crystalline?
    Dark.
On that part where you say that the road was only two feet away, is there another place that is two feet away?
    Yes, sir, also here on the lakeshore, from the wall towards there another part, approximately fifty or one hundred feet.

    .     .     .     .     .     .     .     .

When you go to the town of Patillas, do you necessarily have to travel along that highway?
    Yes, sir.
On your trips around there have you seen children in the lake?
    Yes, sir, I have seen them.
Doing what?

They go to the lakeshore to lunch.
What other thing do they do there?
Sometimes the boys from the neighborhood go fishing there.
MR. GIMÉNEZ:
They go fishing?
WITNESS:
Yes, sir.
Would you say that they do that once a year?
No. . . .
Every day?
Not every day, but . . .
Frequently?
Yes, sir.
Do you know if anyone has drowned there?

. ,      .      .      .      .      . .      .      .

WITNESS:
I have rescued two persons from that lake and I tried to rescue another one whom I could not; I rescued Carlitos García and the minor grandson of Carmelo Pagán, and a little way up, a short time ago, another one was rescued.
Someone died?
All.
All died?
Yes, sir.
What were they doing there?
The deceased Carlitos jumped to reach a boat and did not have the opportunity of reaching it.
And the other person?
A child that slipped.
MR. GIMÉNEZ:
From where?
WITNESS:
On the other shore, on Marín's highway.
In the proximities of the lake?
Yes, sir, just like this other child.
And the third one?
Domingo Bernier.
What was he doing?
Swimming.

You say that you saw children there?
Yes, sir.
Doing what?
They go by there along the highway.
What were they doing?
Fishing.
Did they swim there?
Yes, sir.
Did you see at any time some sign or warning telling about the danger there?
Never.
Some sign telling the depth?
No, sir.
Some fence?
None, either.
Mr. Giménez:
Any watchman or guard?
Witness:
No, sir.
At the place where that child was rescued were there those things?
No, sir."

Vázquez testified, also, that the Lake of Patillas is big, that "I think it covers more than 300 or 400 cuerdas." Later he testified that *"here on the lakeshore, you stand and can easily fall into the water"* because the land is soft when it is wet. (Italics ours.) There was no evidence that the land was dry or wet. From the fact that the two families spent the day on the surroundings of the lake in the open air it may be inferred that that day it did not rain there. He said that the boy was found at a depth of 50 feet.

At the threshold it is necessary to note that the *Banker, supra,* and *Altenbach, supra,* cases, on which the determination of liability imposed by the trial court on appellant relies, are clearly distinguishable from the case at bar. The first one dealt with an excavation on a street as in *Murcelo v. H. I. Hettinger & Co.,* 92 P.R.R. 398 (1965). *Altenbach, supra,*

dealt with a reservoir constructed by a railroad company in a residential section for the purpose of furnishing fire protection and supplying water for its needs. For many years children used to go to said reservoir to play, knowledge of which was chargeable to said company. It was justified to hold the company liable for the death by drowning of the child in said reservoir under the doctrine of attractive nuisance. In *Saxton* v. *Plum Orchards*, 40 So.2d 791 (La. 1949), a pool, in a residence where a 4-year-old neighbor's daughter was drowned, was involved. Liability was charged under the attractive nuisance doctrine. These two cases do not reflect the opinion of the majority of the courts about the question.

On the contrary, in the case at bar the deceased child was 7 years old. He was under the supervision of his father who saw him and let him move away from the family group and go toward the rock from where two other children, older than he, were fishing. The Lake of Patillas is a body of water covering an area of some 300 to 400 cuerdas, built as a part of the irrigation and hydroelectric system of the south coast of Puerto Rico. It is situated in a rural zone distant from the residential areas of the nearest towns. On account of its use and dedication it is not different from the irrigation canal which occupied our attention in *Vargas* v. *Water Resources Authority*, 86 P.R.R. 99 (1962), and in *Reyes Aponte and Vega Muñoz* v. *Water Resources Authority*, judgment of March 17, 1970. It does not appear from the record that it had unusual, hidden or concealed dangers or traps. It was not established that on the day of the accident the land between the highway and the lake was soft and that it yielded. The only thing that the evidence establishes is that that condition exists when it is wet. On the other hand, the evidence indicates that that condition was not the cause of the child's fall into the lake but that the child fell from the rock from where two other children were fishing. Neither was it established that any person with greater weight than the child had

slipped or fallen at that place during their desperate goings and comings on that area on account of the tragic accident.

As we indicated in *Vargas, supra,* the doctrine of attractive nuisance is not applicable to bodies of water such as irrigation canals. The same ground can be used to conclude that it does not apply either to lakes such as the Lake of Patillas in the absence of unusual dangers or traps, hidden or concealed. Thus it has been decided in the majority of the jurisdictions in the United States. *Switzer* v. *Dye,* 177 So.2d 539 (Fla. 1965); *Alabama Great Southern R. Co.* v. *Green,* 159 So.2d 823 (Ala. 1964).

In *Fickling* v. *City Council of Augusta,* 138 S.E.2d 437 (Ga. App. 1964), it was stated that a municipal corporation is not liable for the death of a nine-year-old child who was drowned in a fifteen-cuerda lagoon created by extraction of gravel and sand in a residential area and where for 20 years children used to play and where there were no signs or warnings of danger.

In *Hanners* v. *City of Ashland,* 331 S.W.2d 729 (Ky. 1960), it was determined that the principle of attractive nuisance is not applicable in the case of a 7-year-old child who was drowned while he was swimming in a concrete reservoir where children and adults frequently swam during the summertime. Said reservoir did not have any protective device around it except a barbed wire fence. The court stated that said doctrine was not applicable because (1) said places do not create a condition of unnatural concealed or special danger; (2) the possible danger is generally appreciated even by children of tender years; (3) it is practically impossible to adequately guard these places from the invasion of adventurous children except at a cost entirely disproportionate to the risk involved.

In *Jones* v. *Comer,* 374 S.W.2d 465 (Ark. 1964), two boys, 9 and one 8 years old were drowned in a pond which was 150 feet long by 100 feet wide and 15 feet deep which had been

used as a part of a golf course on which an old boat was located near a tree with a hanging cable or rope used by these and other children to swing, play with, and swim. Summary judgment was granted because "The weight of the authorities in this country is that ponds, lakes, streams, reservoirs, and other bodies of water do not constitute an attractive nuisance in the absence of any unusual element of danger."

In *Wilford* v. *Little*, 301 P.2d 282 (Cal. App. 1964), a child 4 and a half years old was drowned upon falling from a diving board of the swimming pool in the property of defendant, which was frequented by children from the neighborhood. It was alleged that the pool was constructed in such a manner that it was difficult for a child to hold onto the sides of the pool and that the child was too young to appreciate the danger involved. Defendant's property where the pool was located was not fenced. A fence could have been installed at a little cost. The pool was visible from the neighborhood. In dismissing the complaint by demurrer, the court stated that the pool did not constitute an attractive nuisance; that "The presence of danger to an unattended infant is not necessarily a test of anything but the need of parental care. An infant is afraid of nothing and in danger of everything when left to his own devices. The primary duty of care is upon the parents of an infant. Their neglect will not convert a situation admittedly dangerous to an infant into an attractive nuisance which would not be so classed as to older children."

In *Anneker* v. *Quinn-Robbins Co.*, 323 P.2d 1073 (Idaho 1958), it was stated that the steep, precipitous, smooth or slippery banks of a pool or stream, when such condition is natural, visible, and readily apparent, do not constitute a hidden peril. In this case the court dismissed a complaint for damages for the death of a three-year-old child which occurred when the child escaped the attention of his mother,

and was attracted to a corner of the school premises close to the edge of a swale which was part of a pond which was created by an abandoned gravel pit belonging to defendant, where the bank which was steep gave way causing the child to fall into the water where he was drowned. See, *Bass* v. *Quinn-Robbins Co.*, 216 P.2d 944 (Idaho 1950). 36 A.L.R. 225.

In view of the foregoing, the judgment rendered in this case by the trial court should be reversed and another rendered dismissing the complaint.

Mr. Chief Justice did not participate herein. Mr. Justice Hernández Matos and Mr. Justice Santana Becerra dissented without opinion.